**NEBCO INTERNATIONAL INC. and Legend Apparel Mfg. Co., Inc., Plaintiffs,**

v.

**M/V NATIONAL INTEGRITY, M/V SALLY OCEAN, M/V NEDLLOYD SINGAPORE, M/V MARIS OTTER and M/V SEALAND ENTERPRISE, their engines, boilers, tackles, etc., in rem,**

v.

**KAWASAKI KISEN KAISHA, LTD., a/k/a K–Line, Nedlloyd Lijnen B.V. Rotterdam, and Sealand Services, Inc., in personam, Defendants.**

Nos. 89 Civ. 1529 (RPP), 89 Civ. 1699 (RPP), 89 Civ. 1701 (RPP) and 89 Civ. 1702 (RPP).

United States District Court, S.D. New York.

Dec. 18, 1990.

Lilly Sullivan Purcell Barkan & Junge, P.C. by Peter A. Junge, Michael John Gregorek, New York City, for plaintiffs.

Kirlin, Campbell & Keating by J. Scot Provan, Laurence E. Curran III, New York City, for defendants Kawasaki Kisen Kaisha, Ltd., Nedlloyd Lijnen B.V. and Sealand Services, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

### I.

### FINDINGS OF FACT

1. These are admiralty claims for loss of cargo within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The following facts were proven by a preponderance of the evidence unless otherwise stated herein.[1]

2. The statutory basis of federal jurisdiction is 28 U.S.C. § 1333.

3. Nebco International, Inc. ("Nebco") and Legend Apparel Mfg. Co. ("Legend Manufacturing") were and are corporations established and existing under the laws of one of the states of the United States of America formerly doing business in this jurisdiction with a principal place of business located at 25 West 37th Street, New York, New York 10018 (P.O. Box 1438). Nebco has been importing and exporting fabrics for many years. Legend Manufacturing was formed in mid–1987 and continued in business until late 1988 or early 1989, when both Nebco and Legend Manufacturing went out of business.

4. Prakash Nebhnani was and is the sole owner of Nebco and owns a controlling position in Legend Manufacturing. Legend Manufacturing was formed to engage only in the garment business. Legend Manufacturing intended to have the orders for garments which it obtained filled with goods manufactured in Trinidad and in other countries, including China.

5. Nedlloyd–Lijnen B.V. ("Nedlloyd") was and still is a foreign corporation doing business in this jurisdiction and the United States of America with an office located at Two Journal Square Plaza, Jersey City, New Jersey 07306. Nedlloyd was and now is engaged in business as a carrier of merchandise by water for hire and owned or

---

1. References to the transcript of the trial in this action, held on September 20, 21 and 24, 1990, are designated "Tr. at __." References to trial exhibits are designated "Exh. __."

operated the M/V NEDLLOYD SING-APORE and the M/V MARIS OTTER.

6. Kawasaki Kisen Kaisha, Ltd. ("K–Line") was and still is a foreign corporation doing business in this jurisdiction and the United States of America with an office located at Two World Trade Center, New York, New York 10048. It was and now is engaged in business as a carrier of merchandise for hire and owned or operated the M/V NATIONAL INTEGRITY and the M/V SALLY OCEAN.

7. Sealand Services, Inc. ("Sealand") was and still is a domestic corporation organized and existing under the laws of one of the states of the United States and is doing business in this jurisdiction and the United States of America with an office located at One World Trade Center, Suite 2711, New York, New York 10048. It was and now is engaged in business as a carrier of merchandise by water for hire and owned or operated the M/V SEALAND ENTERPRISE.

8. Alstons Shipping Limited ("Alstons"), 69 Independent Square, Port of Spain, Trinidad, is the local agent in Trinidad for defendant K–Line.

9. Melville Shipping Limited ("Melville"), 18–20 London Street, Port of Spain, Trinidad, is the local agent in Trinidad for defendant Nedlloyd.

10. Sealand Services, Inc., Furness Building, 90 Independent Square, Port of Spain, Trinidad, is the local office in Trinidad of defendant Sealand.

11. Suntan Industries Holding Ltd. ("Suntan") is a foreign corporation or other business entity organized and existing under and by virtue of the laws of Trinidad and Tobago with an office and manufacturing plant at 208–209 Eastern Main Road, Tacarigua, Trinidad. Suntan has been engaged in the manufacture of garments since at least 1982.

12. Legend Apparel Trinidad Ltd. ("Legend Trinidad") is a foreign corporation or other business entity organized under and by virtue of the laws of Trinidad and Tobago in November 1987 by Ramesh Maharaj, principal officer of Suntan, in order to do business with Legend Manufacturing. Its office and place of business are also at 208–209 Eastern Main Road, Tacarigua, Trinidad.

13. The National Commercial Bank of Trinidad and Tobago ("Bank") is a foreign corporation or other business entity organized and existing under and by virtue of the laws of Trinidad and Tobago, with an office and place of business at Eastern Main Road and Cochrane Street, Tacarigua, Trinidad.

14. In late 1987 and 1988, the defendant ocean carriers issued six (6) negotiable bills of lading in triplicate for the transportation of six (6) shipments of piece goods and accessories from ports in the Far East to Port of Spain, Trinidad. The shipments had been purchased by Legend Manufacturing by letters of credit issued on its behalf by the State Bank of India. (Exhs. 37–44.) Defendants carried the cargoes to their destination and delivered them without receipt of the original bills of lading, but rather in return for letters of indemnity and guaranty executed by the Bank and Suntan. (Exhs. JE, IQ, IR, JC, JD, GS, IU and IV.)

15. Plaintiff Nebco possesses all the original and negotiable duplicate bills of lading issued by defendants.

16. Letters of guaranty and indemnity issued by Trinidadian banks are accepted in lieu of the original bills of lading on the average of two to four times per month by Alstons, by Melville and by Sealand in Trinidad. Except for this action, none of these companies has ever had any problem or dispute with the holder of the original bills of lading in regard to their acceptance of such bank letters of guaranty and have never had to make any claims against any bank which has issued such letters of guaranty.

## II.

### THE SIX SHIPMENTS

1. *Cargo Carried Pursuant to Nedlloyd's Bill of Lading 1520*

17. Defendant Nedlloyd issued to Spano International ("Spano") bill of lading 1520,

dated December 17, 1987 (Exh. 5) for the receipt of containers UFCU 6046877, said to contain "77 cartons 100% cotton washer sheeting," and KNLU 2983049, said to contain "33 cartons –DO–" (indicating cotton washer sheeting). (Stipulated Fact 11.) By invoice dated December 18, 1987 Spano billed Legend Manufacturing $66,612.00 for such goods. (Exh. 17.) As per the terms and conditions on bill of lading 1520, the containers were carried on board the M/V MARIS OTTER from Hong Kong to Port of Spain where they were discharged from the vessel by Nedlloyd's agent Melville on or about February 7, 1988. (Exh. JL at 10–11; Exh. JB.) As the containers were discharged, the containers were tallied by the Port Authority of Trinidad who at that time took control and possession of the containers. (Exh. JL at 7–9.)

18. On or about February 10, 1988, John V. Gomes, a licensed Trinidadian Customs broker, presented to Melville a letter of indemnity and guaranty endorsed by the Bank and Suntan. (Exh. JM at 54–55; Exh JL at 11.) Upon receipt of the letter of guaranty from Gomes, Melville gave a stamped[2] non-negotiable copy of Nedlloyd bill of lading 1520 to Gomes. (Exh. JL at 12–14.)

19. Gomes delivered the stamped non-negotiable copy of the bill of lading to the Port Authority and in return received containers UFCU 6046877 and KNLU 2983049. Container UFCU 6046877 was delivered to Suntan c/o Legend Trinidad on February 13, 1988 and container KNLU 2983049 was delivered on February 26, 1988 to Suntan c/o of Legend Trinidad at Suntan's plant in Tacarigua, Trinidad. Upon delivery of the containers to Suntan's plant, Trinidadian Customs officials recorded in a Customs Log Book the quantity of cargo unstuffed from the containers. (Exh. JJ at 10–11, 13.) Container UFCU 6046877 contained 35,070.02 yards of cotton washer sheeting and container KNLU 2983049 contained 16,482.05 yards of cotton washer sheeting. (Exh. JJ at 29; Exh. GY and GZ.) The cargo of cotton washer sheeting was then

placed in the bonded area of Suntan's plant which was under the control of Trinidadian Customs at all times. (Exh. JJ at 10, 23, 29 and 67.)

20. Of the material from container UFCU 6046877, all 35,070.02 yards were used to manufacture cotton dresses. (Exh. GY.) Of the material from container KNLU 2983049, 16,150.5 yards were used to manufacture cotton dresses. (Exh. GZ.) The total number of cotton dresses manufactured from the cargo carried on board the M/V MARIS OTTER in containers UFCU 6046877 and KNLU 2983049 was 12,565 dresses. (Exh. JM at 75; Exhs. BD, GY and GZ.) These dresses were shipped by Legend Trinidad to plaintiff Legend Manufacturing in New York via British West Indies Airlines ("BWIA") in April and May of 1988. (Exhs. JM at 52; Exhs. DC, DG, DH, DK–DM, DP, DS–DU, DX, DZ, EC, EE, EH, EI, EL, EM, EP, HW–HZ and IA–IF.) Legend Trinidad invoiced Legend Manufacturing for $69,107.50 for the dresses. (Exh. BD.) Plaintiffs' records show that Legend Manufacturing received the garments and subsequently sold them to U.S. distributor Abe Schrader Company for $119,301.00. (Exhs. EV, EW, EY, FA, FC, FE, FG, FM, FO, FQ, FR and FS.)

### 2. *Cargo carried pursuant to K–Line bill of lading KBPS–4*

21. Defendant K–Line issued to Toyo Menka Kaisha ("Toyo") bill of lading KBPS–4, dated December 25, 1987 (Exh. 1) for the receipt of "20 cartons textile piece goods" packed in container ITLU 645221–9. (Stipulated Fact 12.) By invoice dated December 23, 1987 Toyo billed Legend Manufacturing $22,720.00 for such goods. (Exh. 13.) As per the terms and conditions of bill of lading KBPS–4, container ITLU 645221–9 was carried on board the M/V NATIONAL INTEGRITY from Kobe, Japan to Port of Spain where it was discharged from the vessel by K–Line's agent Alstons Shipping Ltd. on February 13, 1988. (Exh. JK at 9–12.) The container

---

**2.** The stamp used on the non-negotiable copy of the bill of lading instructs the Trinidadian Port Authority to release the cargo described in the

bill of lading to the consignee or his agent, i.e., the holder of the stamped non-negotiable copy of the bill of lading. (Exh. JL at 12.)

was subsequently unstuffed by the Port Authority of Trinidad and Tobago who tallied 20 packages of textile pieces of 100% polyester chiffon. (Exh. IS.)

22. On March 7, 1988, Gomes gave a letter of guaranty endorsed by the Bank and stamped by Suntan and Alstons. (Exh. JK at 15; Exh. JM at 73–74; Exh. IQ.) Alstons in return gave Gomes a stamped non-negotiable copy of K–Line bill of lading KBPS–4. Gomes subsequently delivered this stamped copy to the Trinidadian Port Authority who, upon receipt of that stamped copy, released the 20 packages of textile pieces to Gomes. (Exh. JM at 70–71.) Upon release by the Port Authority under arrangements made with Trinidadian Customs, the 20 cartons were delivered to Suntan c/o Legend Trinidad at Suntan's plant in Tacarigua on March 10, 1988 at which time Customs officials recorded in the Customs Log Book the quantity of cargo that was delivered into the bonded area at Suntan's plant which was under the control and supervision of Trinidadian Customs at all times. (Exh. HA.) The 20 packages discharged from the vessel contained a total of 18,176 yards of polyester chiffon. This material was used in Trinidad to manufacture 5,305 blouses and 5,305 skirts of which 5,300 skirts and 5,300 blouses were shipped to plaintiff Legend Manufacturing in April and May 1988. (Exhs. BD, FI, FK, FT, FW and EV.)

23. The blouses were manufactured according to Style no. 6806 and the skirts were manufactured according to Style no. 6803. (Exh. JM at 100–104; Exh. BD.) The style numbers were supplied to Legend Manufacturing by one of its customers, U.S. retailer Lazarus, with whom Legend Manufacturing had a contract to manufacture blouses and skirts. (Exh. JM at 102.) Legend Trinidad, upon shipment of the blouses and skirts to Legend Manufacturing, invoiced Legend Manufacturing in the amount of $26,500 for the skirts and blouses. (Exhs. BD, CD, CE, CF, CG, CK, CP, CU, CV, CW and CX.) Legend Manufacturing sold the blouses for $25,165.44 and the skirts for $68,121.56 to U.S. retailers Burdines, Lazarus, Foleys and Samtani. (Exh. EV.)

### 3. Cargo carried pursuant to Nedlloyd bill of lading 1530

24. Defendant Nedlloyd issued to Preets Trading Corporation ("Preets") bill of lading 1530, dated January 14, 1988 (Exh. 3) for the receipt of containers KNLU 2529988, said to contain "153 rolls cotton washer sheeting," and KNLU 6213241, said to contain "510 rolls cotton washer sheeting." (Stipulated Fact 13.) By invoice dated January 15, 1988 Preets billed Legend Manufacturing $83,070.00 for such goods. (Exh. 15.) As per the terms and conditions of bill of lading 1530, the containers were carried on board the M/V NEDLLOYD SINGAPORE from Hong Kong to Port of Spain where they were discharged from the vessel by Melville on or about March 7, 1988. (Exh. JL at 9.) As the containers were discharged, they were tallied by the Port Authority of Trinidad. (Exh. JL at 7–9; Exhs. IZ and JA.)

25. On March 16, 1988, Kenneth S. John, a licensed Trinidadian Customs broker, delivered to Melville a letter of guaranty endorsed by the Bank and stamped by Suntan. In exchange for this letter, Melville gave John a stamped non-negotiable copy of bill of lading 1530. (Exh. JI at 15; Exh. JC.) John then took receipt from the Port Authority of the containers. (Exh. JI at 16.) The containers were delivered on March 16, 1988 to Suntan c/o Legend Trinidad at Suntan's plant in Tacarigua. (Exh. JM at 87; Exh. HC.)

26. Upon delivery to Suntan's plant, Customs officials recorded in the Customs Log Book the quantity of cargo from the two containers, a total of 71,000 yards of cotton washer sheeting. (Exh. HC.) The cargo was then placed in the bonded area of Suntan's plant which was under the control of Trinidadian Customs at all times.

27. Of this material, 51,120 yards were used to manufacture 23,070 men's shorts with elastic draw strings and of that number, 22,997 shorts were shipped to plaintiff Legend Manufacturing by Legend Trinidad. (Exh. JM at 87–88; Exhs. BE, BF, BG, BH and BX.) The remainder of the

unused material remains in the bonded area at Suntan's plant. (Exh. HC.) Legend Trinidad invoiced Legend Manufacturing in the amount of $50,593.40 for the shorts. (Exh. BD.) Plaintiff Legend Manufacturing sold 22,673 pairs of the shorts to various U.S. retailers, including Logo 7 and Royal American, for a total of $53,479.46. (Exh. EV.)

### 4. *Cargo carried pursuant to Nedlloyd bill of lading 1531*

28. Defendant Nedlloyd issued to Preets bill of lading 1531, dated January 14, 1988 (Exh. 4), for receipt of container KNLU 2529988 said to contain "52 cartons paper bags, button, shoulder pad." (Stipulated Fact 14.) By invoice dated January 15, 1988 Preets billed Legend Manufacturing $6,189.30 for such goods. (Exh. 16.) As per the terms and conditions of bill of lading 1531, container KNLU 2529988 was carried on board the M/V NEDLLOYD SINGAPORE from Hong Kong to Port of Spain where it was discharged by Melville on or about March 7, 1988. (Exh. JL at 9; Exh. JA.) The container was tallied by the Port Authority after discharge from the vessel on or about March 16, 1988.

29. On or about March 16, 1988, John gave a letter of guaranty endorsed by the Bank and stamped by Suntan to Melville. (Exh. JI at 14–15 and 18–19.) In exchange for that letter, Melville gave John a stamped non-negotiable copy of bill of lading 1531. (Exh. JL at 12–14; Exh. JD.) John gave that copy to the Port Authority for receipt of the container. (Exh. JI at 14–15.)

30. The container was delivered on or about March 19, 1988 to Suntan c/o Legend Trinidad at Suntan's plant in Tacarigua. Upon delivery of the container to Suntan's plant, Trinidadian Customs officials recorded in the Customs Log Book the quantity of cargo unstuffed from the container: 89,800 paper bags, 204 gross of shell buttons and 65,890 shoulder pads. The cargo was then placed in the bonded area at Suntan's plant under the control of Trinidadian Customs at all times. All of these goods were used in the manufacture of the cotton

dresses produced from the fabric carried on board the M/V MARIS OTTER pursuant to Nedlloyd bill of lading 1520. (Exh. JM at 92–93.)

### 5. *Cargo carried pursuant to Sealand bill of lading 955978609*

31. Defendant Sealand issued to Preets bill of lading 955978609, dated February 20, 1988 (Exh. 6), for receipt of container SEAU 426601 said to contain "34 cartons: 10 cartons shoulder pads, 24 cartons elastic bands." (Stipulated Fact 15.) By invoice dated February 20, 1988 Preets billed Legend Manufacturing $3,196.80 for such goods. (Exh. 18.) As per the terms and conditions of bill of lading 955978609, the container was carried on board the M/V ELBE MARU from Hong Kong to New Orleans, on board the M/V SEALAND ENTERPRISE from New Orleans to San Juan, Puerto Rico and on board the M/V PAGAI from San Juan to Port of Spain. (Exh. JR at 9; Exhs. GS, GV and GW.) On or about April 14, 1988, the container was discharged from the M/V PAGAI in Port of Spain by Sealand. (Exh. GV.) On or about April 15, 1988, the container was unstuffed and tallied by the Port Authority who indicated receipt of the 34 cartons.

32. On or about May 13, 1988, John gave Sealand a letter of guaranty endorsed by the Bank and stamped by Suntan. (Exh. GS.) In exchange for that letter, Sealand gave John a stamped non-negotiable copy of bill of lading 955978609. John presented the stamped copy of the non-negotiable bill of lading to the Port Authority in exchange for the 34 cartons. (Exh. JI at 20.)

33. The 34 cartons were subsequently delivered on or about May 13, 1988 to Suntan c/o Legend Trinidad at Suntan's plant in Tacarigua. Upon delivery of the 34 cartons to Suntan's plant, Trinidadian Customs officials entered in the Customs Log Book the quantity of goods contained in the 34 cartons: 10 cartons of shoulder pads and 24 cartons of elastic bands. (Exh. JM at 98–99.) The shoulder pads were used in the manufacture of 100% cotton dresses produced from the cotton washer sheeting

carried on board the M/V MARIS OTTER pursuant to Nedlloyd bill of lading 1520. (Exh. JM at 98–99.) The elastic bands were used in the manufacture of men's shorts with draw strings produced from the cotton washer sheeting carried on board the M/V NEDLLOYD SINGAPORE pursuant to Nedlloyd bill of lading 1530. (Exh. JM at 98–99.) The dresses and shorts were subsequently shipped to Legend Manufacturing in New York who sold those dresses and shorts to various U.S. retailers as previously stated.

### 6. Cargo carried pursuant to K–Line bill of lading KBPS–603

34. Defendant K–Line issued to Mitsubishi Corporation ("Mitsubishi") bill of lading KBPS–603, dated February 26, 1988 (Exh. 2), for receipt of container EKLU 2613083 said to contain "100 cartons textile piece goods." (Stipulated Fact 16.) By invoice dated February 25, 1988 Mitsubishi billed Legend Manufacturing $106,998.21 for the piece goods described as "POLYESTER FUJISILK CRUSHED." [3] (Exh. 14.) As per the terms and conditions of bill of lading KBPS–603, the container EKLU 2613083 was carried on board the M/V SALLY OCEAN from Kobe, Japan to Port of Spain where it was discharged by Alstons on April 13, 1988. (Exh. JK at 12–13; Exh. IW.) At that time, the Port Authority tallied the container and took it into their possession.

35. On or about May 20, 1988, John gave a letter of guaranty endorsed by the Bank and stamped by Suntan to Alstons who, in exchange for that document, gave a stamped non-negotiable copy of K–Line bill of lading KBPS–603 to John. (Exh. JK at 16–18; Exh. IV; Exh. JI at 14, 16–17 and 25.) John presented the stamped copy to the Port Authority who in exchange delivered the container to John. (Exh. JI at 16.) The container was subsequently delivered to Suntan c/o Legend Trinidad at Suntan's plant in Tacarigua on May 24, 1988. Upon arrival of the container at

Suntan, the cargo was tallied from the container by Trinidadian Customs who recorded in the Customs Log Book the quantity of 98,163 yards of Fujisilk fabric. (Exh. JJ at 7–9 and 12; Exh. GX.) The cargo was then placed in the bonded area at Suntan's plant which was under the control of Trinidadian Customs at all times.

36. Of this material, 31,985 yards was cut at Suntan's bonded warehouse to be used to manufacture dresses. (Exh. GX.) Although the manufacturing was on behalf of Legend Manufacturing who had a contract with Abe Schrader to deliver 28,000 dresses to be made from the Fujisilk carried on board the M/V SALLY OCEAN pursuant to K–Line bill of lading KBPS–603, no dress was ever fully manufactured. The semi-manufactured garments and the balance of the raw fabric remain in Suntan's bonded warehouse under the control of Trinidad Customs. (Exh. JM at 67–68.)

### III.

### NATURE OF OPERATIONS IN TRINIDAD

37. Legend Manufacturing's purpose in directing the shipments to Port of Spain, Trinidad, was to manufacture garments in Trinidad for its U.S. customers. Malcolm Starr, a principal of Legend Manufacturing, was instrumental in obtaining orders from various retail chains or garment distributors located in the U.S. The customers would typically design the garment, prepare the markers or patterns to be cut and select the type of fabric and accessories to be used.

38. The customers would pay for an order either upon invoice by Legend Manufacturing or by drafts against the customer's letter of credit to Legend Manufacturing.

39. Legend Trinidad was formed in November 1987. Its sole place of business was at Suntan's plant in Trinidad. Suntan was a garment manufacturer whose plant contained a bonded warehouse operated un-

---

**3.** "Polyester Fujisilk Crushed" is an imitation silk fabric which is purposely wrinkled in appearance. (Exh. JM at 69.)

der the authority of the Industrial Development Corporation ("IDC"). The IDC, a ministry of Trinidad, had authority to develop the so-called 807 Program which was supervised by Trinidad Customs. Under Trinidadian law and Customs Regulations 193–210, fabric could be imported into Trinidad free of duty provided the goods were re-exported after manufacture. Suntan's bonded warehouse, a high security area under the joint control of Suntan and Trinidad Customs, was authorized to operate under Regulations 193–210 and the 807 Program. Customs' control over the goods imported involved checking the amount of fabric and other goods imported by the bonded warehouse, checking the markers or patterns to be utilized in cutting the garments from the fabric, calculating the number of garments possible to be cut and produced from the fabric, certifying the number of garments actually cut and then certifying the number of garments which were in fact exported. (Exh. JJ at 17 and 23.) Under this program, once the garments are cut in a bonded warehouse under Customs supervision, they may be sewn and assembled on premises which are not bonded, as long as the completed garments are properly accounted for by the bonded warehouse when exported. (Exh. JJ at 98–101.)

40. In the United States, the 807 Program refers to garments cut in the United States and exported to Trinidad for sewing and assembly, and then imported pursuant to item 807 of the tariff schedules of the United States. In Trinidad the 807 Program includes the importation of fabric and its manufacture into garments for export under bond pursuant to Trinidad regulations. In Trinidad the 807 Program includes two categories: the General Access Levels ("GAL") garment program and the Designated Consultation Levels ("DCL") garment program. (Exh. JO at 7.)

41. Trinidad's Customs records reflect that each of the shipments at issue here was delivered to Suntan's bonded warehouse where the fabric was cut into patterns. The records also reflect that, in connection with some of the shipments at issue, garments manufactured from such fabric were exported while other fabrics or garments remain under bond in Trinidad. (Exhs. GY, GZ and HA–HC.)

## IV.

### CONTRACT BETWEEN LEGEND MANUFACTURING AND LEGEND TRINIDAD FOR THE MANUFACTURE OF GARMENTS

42. Legend Trinidad had a three-year contract with Legend Manufacturing as of November 20, 1987, but drafted and signed during February or March 1988, and transmitted to Legend Trinidad on March 4, 1988. (Exh. 46.) Under that contract Legend Trinidad was to be responsible for the manufacture and assembly of garments in Trinidadian factories based on orders obtained by Legend Manufacturing. Legend Manufacturing was to obtain and arrange for confirmed letters of credit for Legend Trinidad in the amount of the total price stated in each order obtained by Legend Manufacturing. (Exh. 46.)

43. According to the contract, Legend Manufacturing was to provide Legend Trinidad and the said factories with the necessary personnel, know-how, expertise and technical assistance to enable each of them, respectively, to properly manufacture the garments. Legend Trinidad was to provide Legend Manufacturing with (1) a performance bond equal to 25% of the total price of each order; (2) back-to-back letter of credit facilities on each order under DCL, not 'to purchase,' but "in order to facilitate the purchase of raw materials and accessories covered by each said letter of Credit." Legend Trinidad was also (3) to guarantee and provide Legend Manufacturing with the necessary factories to manufacture goods under the GAL and DCL garment programs; and (4) to pay Legend Manufacturing a fee equal to twenty percent of the total price stated in each order. (Exh. 46.) The contract is silent on who was to pay for, purchase, provide or own the raw materials and accessories.

44. None of the cargo at issue entered the internal commerce of Trinidad because it was destined for manufacture into gar-

ments to be shipped from Trinidad to the United States. (Exh. JM at 15–16.) Under the regulations pertaining to importation of such goods, the cargo was always in the control of Trinidadian Customs while it was in Trinidad. (Exh. JJ at 23.) To comply with Trinidadian regulations pertaining to this type of importation, it was necessary to have a bonded area in which to keep the cargo secure. Neither Legend Trinidad nor Legend Manufacturing had such a bonded warehouse because they did not have a concession from the IDC. (Exh. JM at 14.) Therefore, Legend Trinidad or Legend Manufacturing contracted with Suntan for the use of Suntan's bonded area. The cargo was thus shipped and delivered to Suntan c/o Legend Trinidad so that Legend Trinidad could store the cargo in Suntan's bonded area and so that Suntan could cut the fabrics received into the required patterns prior to the sewing, trimming and assembly operation.

V.

ADDITIONAL TRINIDADIAN GARMENT MANUFACTURERS WERE SUBCONTRACTED AS PER LEGEND MANUFACTURING'S APPROVAL

45. Although plaintiff Legend Manufacturing had a contract with Legend Trinidad to manufacture dresses, pants, blouses and skirts, the contract contemplated that Legend Trinidad did not have the capacity to do all the manufacturing of the garments itself and that it would subcontract with other Trinidadian garment manufacturers. Legend Manufacturing approved all the subcontracts after inspecting the factories to ensure that they could sew, trim and assemble the garments at a level of quality satisfactory to Legend Manufacturing's U.S. customers. (Tr. at 181–91, 211–12.)

46. In addition to Suntan, Jaymore Garments (Caribbean) Ltd. ("Jaymore"), Glamour Girl Lingerie ("Glamour Girl"), Viscount Garment Manufacturing ("Viscount")

and Juman Garment Manufacturing ("Juman") were hired to sew, trim and assemble dresses from the 100% cotton washer sheeting carried on board the M/V MARIS OTTER pursuant to Nedlloyd bill of lading 1520 and the accessories carried on board the M/V SEALAND ENTERPRISE pursuant to Sealand bill of lading 955978609. (Exh. JM at 39–42.) Juman was hired to sew, trim and assemble blouses and skirts from the cargo of polyester chiffon carried on board the M/V NATIONAL INTEGRITY pursuant to K–Line bill of lading KBPS–4. (Exh. JM at 23, 72 and 78.) Zanis Garment Manufacturing ("Zanis") was hired to manufacture pants from the cargo of cotton washer sheeting and accessories carried on board the M/V NEDLLOYD SINGAPORE pursuant to Nedlloyd bills of lading 1530 and 1531, respectively. (Exh. JM at 87–88.) Suntan itself was to manufacture the dresses from the Fujisilk carried on board the M/V SALLY OCEAN. (Exh. JM at 68–69.)

VI.

PLAINTIFFS WERE AWARE AT ALL RELEVANT TIMES THAT THE CARGO CARRIED BY THE DEFENDANTS HAD BEEN DELIVERED TO LEGEND TRINIDAD AS PER PLAINTIFF LEGEND MANUFACTURING INSTRUCTIONS

47. Nebhnani was the sole owner of Nebco and owned at least 40–70% of Legend Manufacturing. (Tr. at 17–18.) Nebhnani controlled all operations of both companies reserving financial matters particularly to himself. (Tr. at 69.) As consideration for the bills of lading at issue, Nebhnani testified that Nebco advanced money to Legend Manufacturing whenever it needed money. (Tr. at 85, 141–42.)[4]

48. Nebhnani and Starr directly negotiated prices of sewing and assembling garments from the cargoes with the Trinidadian manufacturers. (See, e.g., Exh. JP at

---

**4.** Although formally requested by defendants (Nebhnani Aff., Exhs. 1 & 4), plaintiffs never produced the relevant financial records relating to the transaction at issue and the sales and transfers of funds relating thereto, including ledger books, purchase orders or cancellation notices. (Tr. at 232.)

10, 14.) Nebhnani discussed with Starr and Maharaj the MARIS OTTER cargo of Spano fabric in regard to the difficulties that might arise from cutting the fabric because of its departures from specified width. (Tr. at 201 and 399.) On March 8, 1988 Nebhnani determined to make a claim against Spano due to this departure. (Exh. GQ.) Nebhnani pushed the Trinidadian manufacturers to deliver the garments manufactured from the MARIS OTTER cargo by specified delivery dates. (Tr. at 215.)

49. Starr made a number of visits to Trinidad in 1987 and spent 55 days in Trinidad between February and May 1988. (Exh. GN.) He testified that he was "down there practically every month." (Tr. at 383.) While he was "down there," he was in constant communication with Nebhnani. Starr visited Trinidad with some of Legend Manufacturing's U.S. customers to show them the Trinidadian subcontractors' factories to ensure that the quality of the garments produced by those factories was acceptable to those customers.[5] He also visited these factories to supervise the production of those garments with various subcontractors. (Tr. at 199–200.) Starr kept watch over a number of the subcontractors, including Suntan, Glamour Girl, Northwest Cleaners Ltd. ("Northwest"), Offshore Garments, Zanis, Jaymore, Viscount and Juman. (Tr. at 211–12 and 393; JP at 6.)

50. Legend Manufacturing sent Hyo Suk Im to Trinidad to control the proper manufacture of the orders it received. Im was in Trinidad for lengthy periods from September 28, 1987 until June 26, 1988 on behalf of Legend Manufacturing. (Tr. at 500–01; Exh. JN.) Between February 13 and June 26, 1988, the time the subject cargoes were in Trinidad, Im spent 85 days there. While in Trinidad, she and Starr undertook responsibility for and managed the quality control and production aspects of the garment manufacturing operation at all the factories. (Tr. at 498–501.)

51. Starr's responsibilities at Legend Manufacturing included ensuring that the garments were cut to their customers' specifications and that the markers or patterns used in cutting garments were sent to Legend Trinidad by Legend Manufacturing's customers. (Tr. at 211 and 213.) Starr also took actions to ensure that Legend Trinidad cleared the cargo on time, the fabric was manufactured into garments at Trinidadian factories that could do quality work, and those factories met Legend Manufacturing's delivery dates. (Exh. JM at 20; Exh. GP; Tr. at 410–11.)

52. Starr met directly with the Trinidadian factories to negotiate the prices to be paid for their manufacturing work and to ensure that those factories would meet the specified delivery dates. Legend Manufacturing constantly had a difficult time obtaining correctly filled orders delivered to their U.S. customers by the specified delivery dates. (Tr. at 382–83 and 411–12.) Need to meet delivery dates caused Starr to press Maharaj to see that the Customs brokers (i.e., Gomes and John) completed all the necessary documents in order that the garments manufactured from the cargo entered and left Trinidad without delay. (Tr. at 388–89.)

53. Legend Manufacturing also made agreements with the subcontractors for Legend Trinidad and supervised the performance of those contracts. In February 1988, Starr negotiated with Jaymore's managing director, Joshua Kanhai, for Jaymore to manufacture ladies cotton dresses and the price per dress. (Exh. JO at 11–12 and 14.) Im subsequently visited Jaymore's factory six times in February and March 1988. (Exh. JO at 18.) Im was to supervise Jaymore's operations and the manufacturing quality. (Exh. JO at 16.) Im trained the Trinidadian garment workers at Jaymore and at the other Trinidadian subcontractors to manufacture garments from the cargoes at issue. (Tr. at 70–72.) Im had previously inspected the Trinidadian factories for Legend Manufacturing to see

---

**5.** Jordache, Abe Schrader and Spiegel's were some of Legend New York's customers in the United States. (Tr. at 71 and 297.)

how they put a garment together and how closely their final product matched the sample Im had left with them. (Tr. at 501.)

54. Jaymore boxed the dresses manufactured pursuant to Style DB-1 from the cotton washer sheeting carried on board the M/V MARIS OTTER pursuant to Nedlloyd bill of lading 1520 and marked the cartons for shipment to Legend Manufacturing. (Exh. JO at 14 and 18.) Later, Starr asked Kanhai to manufacture garments from the Fujisilk fabric carried on board the M/V SALLY OCEAN that Legend Manufacturing was expecting to or had in fact already received in Trinidad. (Exh. JO at 21–22.) Starr made the request because Suntan was not technically capable of manufacturing the blouses and skirts from the SALLY OCEAN cargo and Nebhnani had instructed Starr to find another manufacturer. (Exh. JM at 72.)

55. Plaintiff Legend Manufacturing was aware at all times that Northwest was steam pressing and packing into boxes for export the garments manufactured from the cargo at issue. (Exh. JP at 14–17.) Nebhnani and Starr employed Northwest for this task on behalf of Legend Manufacturing. (Exh. JP at 8–14.) Im visited Northwest's plant as often as five days per week to manage the quality control aspect of Northwest's work. (Exh. JP at 20–21.) Starr and Im asked Northwest to increase their production and often took delivery of the boxed garments. (Exh. JP at 16–17.) The employees of Legend Manufacturing, Starr and Im, were aware that such manufacturing was occurring and were in frequent contact with Nebhnani. Hence, plaintiff Legend Manufacturing was fully aware at all times that garments were being manufactured from the cargo carried pursuant to the six bills of lading at issue.

56. When Starr went to Trinidad in February 1988, it was to ensure that deliveries to customers were on time and for quality control reasons. (Tr. at 382–84.) During that time Starr was asked by Nebhnani on at least one occasion to have Maharaj get one of the shipments cleared. (Exh. GP.) Starr often complained to Maharaj about the length of time it took to have the goods cleared by Trinidad Customs so that manufacture could continue. (Tr. at 388–89.) Starr, due to his responsibility for production, knew when the shipments required for production had arrived and, due to his interest in prompt delivery of finished goods, pressed Maharaj for Customs clearance to effect delivery of such goods.

57. When Starr was in Trinidad in April 1988, he knew that Suntan was cutting and other Trinidadian subcontractors were sewing, trimming and assembling goods for Legend Manufacturing's orders. (Tr. at 312.) He was also aware of which goods ordered were to be used for which customers' orders and when those goods arrived in port. Starr remained in Trinidad until April 28, 1988 trying to get the orders manufactured and delivered to Legend Manufacturing. (Tr. at 383–84; Exh. GN.) Nebhnani's initials, which the plaintiffs' document examiner witness did not challenge, and Nebco's stamp appear on the Nebco invoices (Exhs. IG–IK) used in addition to the bank letters of guaranty and indemnity to secure release of the cargo.[6] In view of the fact that (1) Nebhnani and Maharaj had known each other for a long time, (2) that Maharaj and Suntan were in financial difficulties in January and February 1988, (3) that Nebhnani and Maharaj were still good friends as shown by Nebhnani's lengthy stay at Maharaj's home in February 1988, (4) that the amounts stated on the Nebco invoices (Exhs. 25–30 and

---

6. Exhibits IG–IK are invoices from Nebco to Suntan c/o Legend Trinidad for the goods in each of the shipments at issue here except for the shoulder pads and elastic bands carried on board the M/V ELBE MARU, M/V SEA-LAND ENTERPRISE and M/V PAGAI pursuant to bill of lading 955978609 for which there is no Nebco invoice in the record. Exhibits IG–IK are dated prior to the arrival date of each vessel in Trinidad.

Customs brokers John and Gomes used the Nebco invoices (Exhs. IG–IK) to prepare the duty-free entry forms signed by Suntan and approved by Trinidad Customs for each shipment. (*See, e.g.,* Exhs. HD, HO, HP and HV; Exh. JI at 8–14.) The duty-free entry forms are necessary both to obtain release of the cargo from the port of importation (Exh. JJ at 10) and in order to enter the goods into Legend Trinidad's factory. (Exh. JI at 13–14.)

IG–IK) were inflated and not treated by Starr of Legend Manufacturing as the cost of goods in Trinidad (*see* Finding 72, *infra*), and (5) the fact that there is no written evidence of any demand for payment by Nebco in the relevant time period for the cargoes, the Court finds that Nebhnani determined to extend credit to Suntan and in that connection Nebhnani authorized Gomes, John and Suntan to use the bank letters of guaranty and indemnity to release the cargoes at issue to Suntan. (*See* Exhs. JE, IQ, IR, JC, JD, GS, IU and IV; Exhs. IG–IK; Exh. JI at 14–21; Exh. JM at 23–30, 67 and 151.)

58. Nebhnani, and thus plaintiffs Nebco and Legend Manufacturing, became fully aware on February 12 or 13, 1988 that the container of cargo carried on board the M/V MARIS OTTER pursuant to Nedlloyd bill of lading 1520 had been delivered to Legend Trinidad at Suntan's plant. (Tr. at 355–56.) Nebhnani was staying in the home of Maharaj of Suntan during a lengthy stay in Trinidad (Tr. at 157; Nebhnani Supp. Aff. ¶ 8) and they communicated with each other frequently during that time. (Tr. at 555–58; Exh. JH at 5–6.) Nebhnani was present on the premises when the cargo was opened after it had been released by Nedlloyd's agent Melville upon receipt of a letter of indemnity and guaranty and not by cash payment for release of original negotiable bills of lading. (Tr. at 57–58, 61 and 355–56; Exh. JM at 36.) Nebhnani has admitted that he saw the MARIS OTTER cargo in Suntan's bonded warehouse in February and that he asked how the cargo had been released and was told by Maharaj that "he had made some kind of arrangement with some kind of government official in Trinidad whereby they would release the cargo," (Tr. at 58) "with some bonds, something like that...." (Tr. at 60.) Nebhnani *never* instructed Suntan or Legend Trinidad *not* to proceed with the cutting, sewing or assembly of garments from the MARIS OTTER cargo. Nor did he attempt to take possession of the goods for non-payment of invoice or protect against similar future delivery by defendants of the other goods ordered. (Tr. at 163 and 225.)

59. Due to the evidence reflecting Legend Manufacturing's assumption of control in Trinidad over the manufacture and delivery of the garments required to meet its orders from customers the Court concludes (1) Nebhnani and plaintiffs were informed when each cargo at issue was delivered to Suntan and/or Legend Trinidad; (2) plaintiffs were aware that Suntan received all six cargoes on behalf of Legend Trinidad at the time Suntan received each of those cargoes between February 12, 1988 and May 1988; (3) plaintiffs were aware that Suntan was obtaining the release of the cargo without presenting the negotiable bills of lading; and (4) plaintiffs had authorized Gomes, John and Suntan to present bank letters of guaranty and indemnity to effectuate the release of the cargo without surrender of the original bills of lading. (Tr. at 72–74.)

## VII.

### CERTAIN TESTIMONY OF PLAINTIFF'S CONTROLLING STOCKHOLDER AND CHIEF EXECUTIVE OFFICE LACKS CREDIBILITY

60. In his affidavit of August 4, 1989, paragraph 16, Nebhnani swore, "The carriers involved in these cases were instructed not to deliver the subject cargoes without surrender of the bills of lading ..." (Tr. at 227.) Yet, on trial he acknowledged this was not true and that the defendants were never instructed not to deliver the cargo without the original bills of lading. (Tr. at 224–25, 229.)

61. Nebhnani also testified (Tr. at 156) that while he was in Trinidad, he never discussed the contract between Legend Manufacturing and Legend Trinidad (Exh. 46), and did not know whether Maharaj had used counsel in regard to drafting the contract between Legend Manufacturing and Legend Trinidad. (Tr. at 39.) However at trial, Michael Mackay, Esq. testified that he had met with Nebhnani and Maharaj in Trinidad in November 1987 to discuss the incorporation of Legend Trinidad and again in February at Suntan's premises, where Nebhnani gave him detailed instructions as

to how a draft of the contract should be redrafted. (Tr. at 349–55.)

62. Nebhnani testified he had not seen the MARIS OTTER container of cargo delivered to Suntan's plant because he was not at Suntan's plant on the delivery day. (Tr. at 158–59.) Defendants' Exhibit GY proves that container UFCU 6046897 was delivered to Suntan's plant and opened on February 13, 1988, and MacKay had a definite recollection of Nebhnani being present at the premises while the container was being unstuffed and of Nebhnani complaining about the misdelivery of buttons. (Tr. at 355–56.) MacKay has not been Maharaj's attorney since mid–1988 and has bills outstanding from Maharaj or Suntan and thus is deemed a disinterested witness.

63. Nebhnani testified he was not familiar with Northwest. (Tr. at 259.) Paul Lum, owner of Northwest, testified, however, that he and Nebhnani, on behalf of Legend Manufacturing, made a verbal contract in February 1988 for Northwest to press and pack finished garments for export and that "Legend Apparel [i.e., Legend Manufacturing] was supposed to pay us [Northwest] through Suntan Garment" because Lum had asked to bill Legend Manufacturing through Suntan. (Exh. JP at 12–13 and 8–14.)

64. Nebhnani testified he did not know until June 1988 about the unloading of the cargo of elastic bands delivered to Suntan. (Tr. at 72.) Starr testified, however, that he left Trinidad in late April and that before he left he saw the elastic bands delivered at Suntan's warehouse (Tr. at 400), and that the elastic bands were necessary for the manufacture of the order of men's shorts which Legend Manufacturing had received from Logo 7. (Tr. at 400.) Furthermore, Nebhnani's testimony about recalling Starr in late April indicates he knew the shipment had been received at that time. (Tr. at 69–70.)

65. Nebhnani testified he had never met or hired Gomes. (Tr. at 120–21.) Marshall Jablon, a former employee of Legend Manufacturing, confirmed testimony by Maharaj that Gomes was hired by Nebhnani for Legend Manufacturing. (Tr. at 566–67.)

66. Nebhnani also testified he did not know or hire Kenneth John. (Tr. at 121.) Both John and Maharaj testified, to the contrary, that Nebhnani had hired John as Legend Manufacturing's Customs broker. (Tr. at 452–53 and 524; Exh. JI at 12; Exh. JM at 55.)

67. Nebhnani's claim (Tr. at 65–67) that in February 1988 when he learned of the delivery of the Spano fabric from the M/V MARIS OTTER he was given an excuse by Maharaj for non-payment for the original bill of lading which he believed and relied on for 4 to 6 weeks (Tr. at 163–64) is hardly credible. He testified he knew Maharaj was in financial difficulties in January–February 1988. (Tr. at 229–30.) Under such circumstances a businessman would demand written or third-party confirmation of payment of a $99,918 invoice. (Exh. 29.) Nebhnani's failing to demand confirmation of payment for later shipments is similarly inexplicable unless Nebhnani had extended credit to Maharaj.

68. Nebhnani's testimony that Maharaj had explained to him that the MARIS OTTER cargo was released to Suntan because Maharaj had "made some kind of arrangements with the [Trinidadian] government with some bonds" (Tr. at 60) also lacks credibility. Legend Trinidad had already been in business in Trinidad for a number of months. Nebhnani must have already known about garment manufacture under bond. The GAL and DCL programs were referred to in Exhibit 46, the contract between Legend Manufacturing and Legend Trinidad.

69. Nebhnani's testimony that he recalled Starr from Trinidad after he called Starr and "asked him to explain [to] me how the garments were being made down there, like shorts and blouses and skirts, which were part of the shipments which I told him not to release," (Tr. at 69) is inconsistent with Starr's testimony that upon his arrival in New York he told Nebhnani "[i]n fact I didn't want to stay with him if we were going to operate in Trinidad. And I had asked him not to ship any more goods down to Trinidad." (Tr. at 390.)

70. Nebhnani's typewritten (or computer-generated) invoices (Exhs. 25–30) to Suntan on behalf of Nebco are suspicious. They are not on Nebco letterhead but instead bear typewritten letterhead information. Five of the six invoices appear to be original documents. Rather than merely bearing a date and place of making, they state they are "Dated at New York." Why original documents are still in Nebhnani's possession is unexplained. There are no covering letters of transmittal of these invoices and no reference to the bills and their non-payment in any contemporaneous document whatsoever.

71. The Court is unable to find that the Nebco invoices, Plaintiffs' Exhibits 25–30 and Defendants' Exhibits IG–IK, reflect accurately any business arrangements by Nebco. Plaintiffs' Exhibits 25–30 are "Dated at New York," whereas Nebhnani, who controlled all financial dealings of both plaintiff companies, was in Trinidad on at least one of the dates in question. Nebhnani testified (Tr. at 83–84 and 96) that he delivered the invoices for the NEDLLOYD SINGAPORE cargo (Exhs. 27 and 28) to Maharaj personally yet the similarity of the invoices in form indicates that they were prepared simultaneously. Defendants' Exhibits IG–IK contain unlikely identification entries. Nevertheless, both groups of exhibits are invoices for the same amounts, a 50% markup over cost to Legend Manufacturing (*see* ¶ 72, *infra*), which shows a meeting of the minds on markup but not on method of payment. The price markup and profit to Nebco would constitute a siphoning off by Nebhnani of profits which should have been shared with Starr as a shareholder of Legend Manufacturing.

72. The 50% markup by Nebco over cost to Legend Manufacturing as shown in Exhibits 25–30 and IG–IK is contradicted by other documents. Because Suntan was unable to assemble the belts for the cotton washer sheeting dresses, some of the cotton washer sheeting was shipped to Miami Lakes Cutting Inc. ("Miami") in the United States. (Tr. at 396–97.) Starr's letter dated March 12, 1988 to Miami (Exh. GO) and the invoice from Suntan to Legend Manufacturing c/o Miami stating "Notify: Joseph and Schiller Brokers" (Exh. IL) highlight the irregularity of the Nebco invoices, i.e., Plaintiffs' Exhibits 25–30 and Defendants' Exhibits IG–IK. In Exhibit GO, Starr used a unit price of $1.30 per linear yard for the cotton washer sheeting from which the belts were made. This is roughly the original price charged to Legend Manufacturing by the sellers of the fabric, Preets and Spano ($1.17 and $1.30 per yard, respectively). (Exhs. 15 and 17.) In Exhibits 27, 29, II, and IK, however, Nebco invoiced Suntan for the cotton washer sheeting at a unit price of $1.97 and $1.95 per yard for the NEDLLOYD SINGAPORE and the MARIS OTTER cargo, respectively. Exhibit GO from Starr indicates that Legend Manufacturing regarded the fabric in Suntan's hands in Trinidad as having a value equal to Legend Manufacturing's purchase price from Preets and Spano and not Nebco's selling price or Suntan's or Legend Trinidad's purchase price as reflected in Exhibits 25–30 and IG–IK. Thus Nebco's invoices to Suntan were for a marked-up value of 50% for some purpose other than billing Suntan on a cash basis. Either the purchase price was at cost or, more likely, the invoices were prepared for credit purposes to record plaintiffs' share of the total proceeds of a joint venture with Legend Trinidad and Suntan.

73. Plaintiffs, despite a demand for production in connection with the Nebhnani deposition (Nebhnani Aff., Exh. 4) and a later written demand (Nebhnani Aff., Exh. 1), have not produced many relevant documents, and have failed to produce records to show a course of dealing sufficient for the Court to find that any payment was due upon arrival of the ships in question.

74. The Court finds by a preponderance of the evidence that Legend Trinidad's invoices to Legend Manufacturing (Exhs. 73–97) were for the full cost of the manufactured garments in question and not merely for the cutting, making and trimming operation as claimed by Maharaj. Exhibits GO and IL are not proof of Maharaj's claim that the invoices were only for cutting, making and trimming because the value stated on Exhibits GO and IL was for a

manufacturing and return for assembly operation, not invoicing the garments for sale.

75. The Court is unable to find by a preponderance of the evidence that Nebco was a bona fide holder in due course of the negotiable bills of lading. Due to plaintiffs' failure to produce many documents, there is no evidence on the record other than Nebhnani's testimony that Nebco is a purchaser for value the original bills of lading from Legend Manufacturing. Those documents which have been received in evidence indicate that Legend Manufacturing purchased the cargo in question by bank credit accumulated by the letters of credit issued by the garment distributors and chain stores to Legend Manufacturing for the orders in question.

76. Although comparing a xerox copy of a letter with an original signature is not a favored method of determining authenticity in document examination, the Court finds that Exhibit 31 is a false document. Certain data in the exhibit are clearly not consistent with its date. The genesis of the document, however, as one created by Maharaj is unclear. At one point in his testimony Nebhnani referred to the document as "a letter that I had written on February 2, 1988" (Tr. at 340) but soon thereafter claimed that the letter, including his signature, is a forgery. (Tr. at 340.) The document refers to letter of credit information which on this record was only known to Legend Manufacturing, Nebhnani and State Bank of India. No letter of credit transmittal documents to Maharaj or to defendants have been produced, nor were they required for purposes of payment for the cargo. The invoice amounts, according to Nebhnani, were 50% more than the letter of credit amounts, and were the sums due to obtain delivery of the bills of lading. Under these circumstances, that Maharaj was responsible for the creation of Exhibit 31 is not clear.

## VIII.

### CONCLUSIONS OF LAW

1. On the basis of the entire record the Court concludes that the manufacture of garments in Trinidad for Legend Manufacturing's customers was controlled in every aspect by Legend Manufacturing, and that Suntan and Legend Trinidad, as well as Gomes and John, were utilized by Nebhnani's Legend Manufacturing for that purpose to the extent of acting at the behest of Legend Manufacturing and/or Nebco in the clearing for importation to Trinidad of fabrics and accessories to be used in manufacture, and to obtain delivery from defendants of such fabrics and accessories. The Court also concludes that it was the custom of the Port of Spain, Trinidad, for ship's agents to accept bank letters of guaranty and indemnity in lieu of negotiable bills of lading on delivering cargo to consignees.

■ 2. Bills of lading are presumed to have been issued subject to industry custom. *See Encyclopaedia Britannica, Inc. v. SS HONG KONG PRODUCER*, 422 F.2d 7, 17 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). This rule should be no less applicable where local industry customs of the port of destination are involved. *Cf. Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 299 (2d Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988) ("[A] shipper's reasonable expectation on booking cargo for shipment is that it will be stowed below deck, unless the shipper agrees to the contrary or a general port custom permits above deck stowage."); *Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.*, 709 F.2d 663, 665 (11th Cir.1983) (local custom involving stamping bills of lading, if followed, may constitute grounds for denying shipper's motion for summary judgment in action by carrier to collect ocean freight charges); *Farrell Lines Inc. v. Highlands Ins. Co.*, 696 F.2d 28 (2d Cir.1982) (scope of carrier's duty under the Harter Act to make "proper delivery" is subject to modification based upon the law, regulations and custom of the port of destination).

■ 3. Cases involving the doctrine of "estoppel by negligence," although not strictly applicable to this action, provide a useful analogy. Estoppel by negligence

acts to bar a shipper's claim in an action against a carrier for misdelivery of cargo where the shipper or bailor's own negligence induced the carrier to misdeliver or improperly release the cargo. Absent negligent inducement, the carrier or bailee is strictly liable for misdelivered goods. *See David Crystal, Inc. v. Cunard Steam–Ship Co.*, 339 F.2d 295, 298–99 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965) (negligence of consignee's customs broker). The Second Circuit follows the estoppel rule even though it admitted in *David Crystal* that the carrier "... is in a better position than the [shipper] to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur." *Id.* at 298. *See also MacAndrews & Forbes Co. v. United States*, 23 F.2d 667, 668 (3d Cir.1928) (shipper's negligence "had clothed the [improper recipient of the goods] with such semblance of authenticity that the delivery clerk was justified in assuming the status of [the recipient] was that of an authorized holder of the delivery order.") In this case Nebhnani and plaintiffs knew that the cargoes were being cleared by authorized acts of Gomes, John and Suntan and knew that the release of the cargo was induced without presentation of original bills of lading. Instead of acting to maintain or assert their rights in the cargo, plaintiffs elected to allow the manufacture of the garments to proceed and took actions in furtherance of that manufacturing process by determining to extend credit and to proceed without requiring advance payment in return for the original bills of lading. These were intentional acts which allowed the bank guaranty practice to continue and which failed to mitigate any damage that might result from the failure to obtain payment upon delivery of the cargo.

4. The Court, having found that Nebhnani and thus the plaintiffs knew that the cargoes were being cleared by means other than delivery of copies of original bills of lading, holds that plaintiffs, having accepted the benefit of such an arrangement, waived their rights to require delivery by presentation of original bills of lading and are estopped from making claims against the defendants for loss of the cargo. *Cf. Aetna Ins. Co. v. M/V LASH ITALIA*, 858 F.2d 190, 193–94 (4th Cir. 1988) (shipper's insurer estopped from denying the applicability of COGSA's $500 per package limitation of liability because shipper, who did not declare a higher value, should have been aware of its power under COGSA to do so); *General Elec. Co. v. MV NEDLLOYD*, 817 F.2d 1022, 1028–29 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988) (in action for loss of cargo, shipper estopped from claiming that carrier's ad valorem charge was so excessive as to prevent shipper's declaration of true value for goods where shipper "obviously knew" it could declare a higher value and evidence suggested shipper had made a business judgment not to do so); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 862 (1st Cir.1987) (having accepted benefit of lower rate of carriage based on declared valuation, shipper is estopped from asserting a higher value in action for loss of the goods); *In re MARINE SULPHUR QUEEN*, 460 F.2d 89, 104–05 (2d Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 326, 34 L.Ed.2d 246 (1972) (shipper estopped from recovering for loss of cargo where it retained authority to approve vessel design and construction and accepted delivery of vessel from shipbuilder).

5. Judgment shall be entered for the defendants together with the costs of these actions.

IT IS SO ORDERED.